**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EDWARD SIALOI; KELLI
SIALOI; FOLENI SIALOI;
GAYLE PASI; LAGO SIALOI;
LIUA SIALOI; HARDY TEO
FALEALILI; TAPILI SOFA;
G. S., a minor, by his father
and guardian ad litem, Foleni
Sialoi; T. O. S., a minor, by
their father and guardian ad
litem, Lago Sialoi; T. A. S., a
minor, by their father and
guardian ad litem, Lago
Sialoi; T. R. S., a minor, by
their father and guardian ad
litem, Lago Sialoi; B.F., a
minor, by his father and
guardian ad litem, Hardy Teo
Falealili; ESTATE OF
SEPTEMBER SIALOI, by her
husband and successor in
interest, Sialoi Sialoi, Jr.,
          *Plaintiffs-Appellees*,

v.

CITY OF SAN DIEGO; ALLEN
SLUSS; BRADLEY PHELPS;
JOSEPH KRAWCZYK; DAVID
ROHOWITS; ANTHONY REESE;

No. 14-55387

D.C. No.
3:11-cv-02280-W-KSC

OPINION

MICHAEL HALL; EDWARD
KASZYCKI; COREY STASCH;
MIGUEL GARCIA; MICHAEL
HAYES; WADE IRWIN; SCOTT
SMITH; KELVIN LUJAN; JOHN
CARROLL; WAYNE DOEDEN;
TAMMY CLENDENEN; TYLER
BIGBIE; RICHARD SLADE;
DAVID HWANG; JONATHAN
BAMBAD; SIGNORINO, Officer;
TENENBAUM, Officer; DOES,
1–30,
          *Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, Senior District Judge, Presiding

Argued and Submitted February 5, 2016
Pasadena, California

Filed May 24, 2016

Before: Stephen Reinhardt, Richard A. Paez,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Reinhardt

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's denial, on summary judgment, of a motion for qualified immunity brought by San Diego police officers in an action under 42 U.S.C. § 1983 and state law alleging, among other things, unlawful arrest and detention, illegal search, and excessive force.

The panel first held that it has jurisdiction to consider this appeal, but that its jurisdiction was limited to deciding only the question whether, taking all the facts in the light most favorable to the plaintiffs, the defendants were entitled to qualified immunity as a matter of law.

The panel held that taking the facts in the light most favorable to the plaintiffs, once officers discovered that an item held by one of the suspects was a mere toy, rather than a handgun, the officers violated clearly established law and acted wholly unreasonably in using extreme force to disrupt a peaceful birthday party for a seven-year-old girl, and in searching the family's apartment without a warrant or consent. Accordingly, the panel affirmed the district court's denial of qualified immunity in all respects.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

John E. Riley (argued), Deputy City Attorney, Jan I. Goldsmith, City Attorney, Office of the San Diego City Attorney, San Diego, California, for Defendants-Appellants.

Michael R. Marrinan (argued), Law Offices of Michael R. Marrinan, San Diego, California, for Plaintiffs-Appellees.

**OPINION**

REINHARDT, Circuit Judge:

In October of 2010, officers with the San Diego Police Department responded to a report that two armed black males had been seen in the parking lot of an apartment complex. When they arrived, the officers, armed with assault rifles and eventually numbering over twenty, encountered not two armed black males but a large Samoan family celebrating the birthday of a seven-year-old girl. The officers detained the members of the family (handcuffing the vast majority of them, including numerous adolescents) and then searched each of them for weapons. Finding nothing incriminating, the officers then searched the family's apartment without a warrant or consent. Again finding nothing incriminating, the officers left without removing a single family member from the scene or filing any charges.

The plaintiffs filed this action against the officers involved in the incident, as well as the City of San Diego, alleging various claims under 42 U.S.C. § 1983 and California law, including unlawful arrest and detention, illegal search, and excessive force. The defendants moved

for summary judgment on the ground of qualified immunity, and the district court granted the motion with respect to the City but denied it with respect to the officers. The officers then appealed the denial of their motion for summary judgment. We affirm the district court.

# I

## A

On Saturday, October 2, 2010, the Sialoi family gathered in front of the apartment belonging to Sialoi Sialoi, Jr. and his wife, September Sialoi, to celebrate the birthday of seven-year-old plaintiff T.R.S. The family held a barbecue during which no alcohol was served or consumed. Around 10:22pm that evening, the manager of the apartment complex called 9-1-1 to report that two black or Samoan adult males had been ducking down around the apartment complex, as if waiting for someone. He reported that one carried a handgun, the other a shotgun. Two minutes later, he called back to provide additional information: the men were black, not Samoan; one had bushy hair and was wearing a brown T-shirt, and the other was wearing a long-sleeved shirt with a hood.

Sergeant Sluss of the San Diego Police Department was in charge of the response to the apartment manager's 9-1-1 call. The sergeant assembled a contact team consisting of "maybe six officers," and assigned Officer Wayne Doeden a team of four officers. The officers arrived on the scene four

minutes after the second call from the apartment manager, and, together, approached the Sialoi party.[1]

When the officers arrived, the Sialoi family was drinking coffee, eating birthday cake, and singing songs. One of the men was playing a guitar, and some of the women were inside the apartment with the youngest children. Sergeant Sluss and his team came around the corner of the apartment building and saw three teenagers between the ages of 13 and 15, G.S., T.O.S., and B.F., playing in the parking lot near the apartment. Sergeant Sluss reported to dispatch that one of the teenagers had something in his hand that appeared to be a handgun. Notably, however, the three teenage boys did not otherwise fit the description provided by the apartment manager: there were three of them, not two; all were Samoan, not black; and none was wearing clothing that matched the apartment manager's description. The officers arrived with their guns drawn at the parking lot where the boys were playing. Some of the officers held AR-15 assault rifles, which the officers pointed at the three teenagers. A police helicopter circled overhead. The helicopter operator informed the police that there were people having a barbecue nearby.

Six or seven police officers first approached 13-year-old B.F., who had nothing in his hands. They demanded that B.F. get on the ground, and he complied. One officer put his knee

---

[1] From this point on, the plaintiffs and defendants disagree on key facts. When reviewing the denial of qualified immunity, we must take all facts in the light most favorable to the plaintiffs. *See George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014). For this reason, the following statement of facts describes the incident as the plaintiffs contend it transpired.

on B.F.'s neck to hold him down, while the others searched him for weapons. After finding nothing, the officers next approached 15-year-old T.O.S. Again, the officers pointed their guns at him and ordered him to get on the ground. T.O.S. complied, lying down next to B.F., where the officers searched him for weapons while pointing their guns at his head. Again, the officers found nothing. Finally, the officers approached 15-year-old G.S., who was standing some distance away between two parked cars in front of the Sialoi apartment. G.S. was holding a plastic paintball gun in his hand. When G.S. saw the officers, he immediately dropped the paintball gun. The officers ordered him to get on the ground, and G.S. replied that he could not fit on the ground between the two cars, but he attempted to comply with the officers' orders anyway. He and several other plaintiffs called out to the officers, attempting to explain to them that the paintball gun was not in fact a real gun but merely a toy. He was then told to crawl out from between the cars to the driveway, where he was searched. Again, the officers found nothing. Immediately after G.S. crawled out from between the cars, an officer walked over and picked up the toy gun. He held the gun in the air and confirmed that it was only a toy. At this point, the officers handcuffed all three teenagers, yanked them off the ground, and placed them in the back of a police car.

The officers then approached the other members of the Sialoi family, and began to detain, search, and handcuff them, including two adult women and a thirteen-year-old girl, T.A.S. By this time, other officers had arrived, increasing the total number present at the scene to over twenty. The officers ordered the plaintiffs one-by-one to keep their hands up and walk to the middle of the parking lot, where they did a pat-down search. Throughout this time, the laser sights on some

of the officers' guns projected red beams of light on the plaintiffs' bodies as they were searched. When the search was complete, each plaintiff was handcuffed and ordered to remain in the middle of the parking lot under armed guard. The officers placed Sialoi Sialoi Jr. in the back of the police car with the three teenagers because he initially refused to put his hands in the air and pleaded with the officers to stop pointing their weapons at the children. The officers also pushed Liua Sialoi, who was pregnant at the time, onto the ground. Edward Sialoi informed the officers that he had a medical condition and recently had back surgery. Because of this, he requested that the officers use two sets of handcuffs. The officers did not comply, and instead, violently yanked his arm behind him, tearing his rotator cuff, labrum, and biceps tendon.

After everyone outside had been handcuffed and moved to the middle of the parking lot (or placed in a police car), the officers ordered anyone inside the apartment to vacate the building. Kelli Sialoi, Gayle Pasi, T.R.S., and Pasi's four-year-old nephew exited the building. They were detained at the curb with the other plaintiffs, but were not handcuffed. Sergeant Sluss and several other officers then entered and searched the Sialois' apartment without a warrant or consent. After the search of the apartment, a lieutenant arrived and asked the officers if any of the handcuffed people were "going downtown." Receiving a negative response, the lieutenant removed September Sialoi's handcuffs and left. The other officers then began removing the handcuffs from the other plaintiffs. The plaintiffs contend that they had been detained for approximately 30–40 minutes, although the police's computerized log of the incident indicates that the search lasted only 17 minutes.

According to the computer-aided dispatch report and the deposition of Sergeant Sluss, the officers were informed a few minutes after they "started securing . . . the scene" that the apartment manager had called to say that the people they had detained were not the suspects that he reported in his disturbance call.  The officers did not attempt to contact the apartment manager or locate the actual suspects.  Later, the plaintiffs learned that no report was ever written about the seizures of the various plaintiffs, the injuries to Edward Sialoi, the search of the Sialoi home, or indeed anything about the incident.

*B*

After the plaintiffs filed suit, the defendants moved for summary judgment both on the basis that the officers' actions did not violate the plaintiffs' rights and that, in any case, the officers were entitled to qualified immunity.  The defendants also sought summary judgment for the claims against the City, asserting that the officers were not acting pursuant to a "policy" within the meaning of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  The district court granted the motion with respect to the City, but denied it with respect to the officers.  It reasoned that the arguments in favor of the individual defendants' qualified immunity rested on disputed factual circumstances appropriately left to a jury—namely, that the three teenaged boys reasonably fit the description of the suspects in the disturbance call and that the officers did not discover that G.S.'s gun was a toy until after the searches had been completed.  The individual defendants filed a motion for reconsideration, which the district court denied.  They then appealed the denial of qualified immunity with respect to the

unlawful arrest and search claims, but did not appeal the denial of qualified immunity as to the excessive force claims.

## II

As a threshold matter, we must determine whether (and, if so, to what extent) we have jurisdiction to consider the individual defendants' appeal. When reviewing a denial of qualified immunity, it is well-established that we lack jurisdiction to review a district court's conclusion that genuine factual disputes exist but that we have jurisdiction to resolve legal questions raised in the appeal. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Huskey v. City of San Jose*, 204 F.3d 893, 896 (9th Cir. 2000). One such legal question is whether, taking all the facts in the light most favorable to the plaintiffs, those facts can sustain a claim that "clearly established constitutional rights have been violated." *Huskey*, 204 F.3d at 896. The plaintiffs argue that we lack jurisdiction to review the denial of qualified immunity because, they contend, the defendants' briefs on appeal merely dispute the plaintiffs' version of what happened. Although it is true that most of the arguments in the defendants' briefs assume the *officers'* version of what happened, the defendants do also argue that they are entitled to qualified immunity as a matter of a law even under the plaintiffs' version of the events.

We therefore have jurisdiction to consider this appeal, but our jurisdiction is limited to deciding only the question whether, taking all the facts in the light most favorable to the plaintiffs, the defendants are entitled to qualified immunity as a matter of law. In doing so, we must consider two questions. First, "whether the facts, '[t]aken in the light most favorable to the party asserting the injury,' show that the officers

violated a constitutional right.'" *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds in Pearson v. Callahan*, 555 U.S. 223 (2009) (alteration in original)). Second, if the officers did violate a right, "whether federal rights asserted by [the] plaintiff were clearly established at the time of the alleged violation." *Id.* (internal quotation marks omitted). A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Put another way, an officer's actions violate clearly established law when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1211 (9th Cir. 2008). We review these questions de novo. *Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004).

## III

Defendants argue that they are entitled to qualified immunity for both the seizure and search of the plaintiffs, and for the warrantless search of the plaintiffs' apartment. Because the officers' actions are subject to several different legal rules, we address the defendants' arguments in the following subparts: (1) whether the officers are entitled to qualified immunity for the seizure of the three teenage boys, G.S., T.O.S., and B.F.; (2) whether the officers are entitled to qualified immunity for the seizure of Sialoi Sialoi Jr.; (3) whether the officers are entitled to qualified immunity for the seizure of the remaining plaintiffs; and (4) whether the officers are entitled to qualified immunity for the warrantless search of the Sialois' apartment. Although the legal standard may differ for each of the officers' actions, the answer to the

question of each action's constitutionality is the same. Taking the facts in the light most favorable to the plaintiffs, once the officers discovered that the item in G.S.'s hand was a mere toy, the officers violated clearly established law and acted wholly unreasonably in using extreme force to disrupt a peaceful birthday party for a seven-year-old girl, and in searching the Sialoi apartment without a warrant or consent. Accordingly, we affirm the district court's denial of qualified immunity in all respects.

*A: The Officers' Seizure of G.S., T.O.S., and B.F.*

　　1.　*Whether the seizure violated the constitutional rights of G.S., T.O.S., and B.F.*

A group of six or seven officers approached the three teenagers, ordered each of them onto the ground, handcuffed them, searched them, and then placed them in the back of a police car. Although the officers engaged in materially indistinguishable conduct toward G.S., T.O.S., and B.F., the defendants, oddly, admit that the officers arrested G.S. but argue that the officers' conduct toward T.O.S. and B.F. amounted to mere investigatory detention. Accordingly, we must first determine whether the officers arrested T.O.S. and B.F. or merely detained them during an investigatory stop.

Although police generally need probable cause to search or seize a person, there exists a limited exception for brief investigatory stops "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In contrast to a full-blown arrest, an investigatory stop need only be justified by reasonable suspicion. *United States v. I.E.V.*, 705 F.3d 430,

434–35 (9th Cir. 2012). "There is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). Instead, we have set forth several factors to distinguish between the two types of seizures, including whether the suspect was handcuffed; whether the police drew their weapons; "whether the police physically restrict the suspect's liberty," including by placing the suspect in a police car; whether "special circumstances" (such as an uncooperative suspect or risk of violence) are present to justify the "intrusive means of effecting a stop"; and whether the officers are outnumbered. *See id.* at 1188–90. We need not discuss these factors in detail, however, because *Washington* answers the question whether the teenagers were arrested or merely detained. In that case, we held that *any reasonable juror would be compelled* to find an arrest where the officers ordered the two plaintiffs from a car, shone a spotlight on them, drew their weapons, handcuffed them, and then placed them in separate police cars. *Washington*, 98 F.3d at 1184, 1192. Taking all the facts in the light most favorable to the plaintiffs, the officers' conduct toward T.O.S. and B.F. was, if anything, more intrusive and thus amounted to an arrest.

"Under the Fourth Amendment, a warrantless arrest requires probable cause," which "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). Whether probable cause exists depends "on the totality of facts" available to the officers, who "may not disregard facts tending to dissipate probable cause." *Id.* at 1073 (internal quotation marks omitted). "In some instances there may initially be probable cause justifying an arrest, but

additional information obtained at the scene may indicate that there is less than a fair probability that the [individual] has committed or is committing a crime. In such cases, execution of the arrest or continuation of the arrest is illegal." *Id*.

Taking the facts in the light most favorable to the plaintiffs, the officers did not have probable cause to arrest the three teenagers. The defendants attempt to justify the arrest on the basis of the fact that G.S. was initially holding what appeared to be a weapon. We may assume that the officers were justified in initiating an investigatory stop of the teenagers after they spotted what they believed to be a gun in G.S.'s hand. The police determined almost immediately after approaching G.S., however, that the gun was, in fact, a toy, and at that point any suspicion that the teenagers were engaged in a crime dissipated.[2] Not only did none of the teenagers possess a gun, but none of them in any way matched the apartment manager's description of the suspects. They were three Samoan teenagers, not two black adults, and none of the boys was wearing either a brown shirt or a hooded long-sleeved T-shirt. Nevertheless, the officers handcuffed all three and placed them in the back of a police car *after* learning that the item in G.S.'s hand was a toy. At a minimum, then, the officers violated the Fourth Amendment by continuing the seizure beyond the point at which they determined that G.S. had not in fact had a weapon in his hand. *See Lopez*, 482 F.3d at 1037.

In sum, once the officers determined that the item in G.S.'s hand was a toy, no officer of "reasonable caution" would have had any reason to believe that G.S., T.O.S., and

---

[2] The defendants do not contend that it is a crime to possess a paintball gun.

B.F. were the suspects the apartment manager described, or were otherwise engaged in unlawful activity.  Accordingly, taking the facts in the light most favorable to the plaintiffs, the officers violated the constitutional rights of G.S., T.O.S., and B.F. when they arrested them.

##    2.    *Whether the constitutional right was clearly established*

Because the standard for probable cause is well settled, the question with respect to whether an unlawful arrest violated clearly established law is "whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011).  Here, the defendants argue that detaining the three teenagers "until further investigation was completed was not unreasonable conduct," given the totality of the circumstances.  It is true, as the defendants argue, that the officers found themselves in a potentially dangerous situation: they were in a high-crime area responding to a report of suspects with weapons.  While these background circumstances are no doubt relevant to the question whether the officers' conduct was reasonable, they do not render it even "reasonably arguable" that probable cause existed for the arrests of the young boys.  Where no facts specific to the arrestees establish probable cause, officers may not rely on general background facts to immunize themselves from suit. *See Crowe v. Cty. of San Diego*, 608 F.3d 406, 439 (9th Cir. 2010) (holding that it is clearly established that "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause *particularized with respect to that person*" (emphasis added) (quoting *Ybarra v.*

*Illinois*, 444 U.S. 85, 91 (1979))). No such particularized facts exist here. To repeat, the officers encountered not two black individuals but instead three Samoans wearing clothing that did not resemble the apartment manager's description. Before handcuffing the three boys and placing them in a police car, the officers knew that the item in G.S.'s hand was a mere toy, knew that none of the boys possessed a gun, and were aware of no other even remotely suspicious activity in which any of the boys had engaged or were engaging. For these reasons, no reasonable officer would have concluded that probable caused existed to arrest the teenagers, and we affirm the district court's denial of qualified immunity for their arrest.

## B: The Officers' Seizure of Sialoi Sialoi Jr.

### 1. Whether the seizure violated Sialoi Sialoi Jr.'s constitutional rights

The officers handcuffed Sialoi Sialoi Jr. and placed him in the back of the police car after he pleaded with the officers to stop pointing their weapons at the children. Sialoi Sialoi Jr. did "raise his voice" and initially refused to raise his hands when directed to do so by the police, but he calmed down within a matter of minutes and complied with the officers' requests when they approached him for the purpose of handcuffing him. As with the three teenagers, the factors set forth in *Washington* compel the conclusion that a rational jury could find that the officers' conduct with respect to Sialoi Sialoi Jr. amounted to an arrest. *See* 98 F.3d at 1188–90. Similarly to G.S., T.O.S., and B.F., the officers patted Sialoi Sialoi Jr. down, handcuffed him, and placed him in the back of a police car. By this time, over twenty officers had arrived at the scene, many of whom had their weapons drawn and

trained on the plaintiffs. The defendants argue that the seizure of Sialoi Sialoi Jr. was a mere detention because he was initially uncooperative. We cannot say, however, as defendants argue, that Sialoi Sialoi Jr.'s temporary refusal to raise his hands and initial objection to the officers' tactics would as a matter of law prevent a rational jury from concluding that he was arrested. To the contrary—in cases in which we have relied on an individual's non-compliance with officers' commands to hold as a matter of law that an arrest did not occur, the individual demonstrated far greater, and far more dangerous, defiance. *See, e.g.*, *Haynie v. Cty. of Los Angeles*, 339 F.3d 1071, 1073–74, 1077 (9th Cir. 2003) (finding no arrest where the suspect initially refused to pull over, made furtive movements with his hands inside his car, refused to submit to a frisk, and continued yelling at the officers after being handcuffed); *Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir. 1995) (finding no arrest where the suspects led officers on a long high-speed chase and, when the suspects finally pulled over, one was "non-compliant and combative" and the other drunk). Accordingly, taking the facts in the light most favorable to Sialoi Sialoi Jr., the officers' conduct amounted to an arrest.

A rational jury could also conclude that this arrest was unlawful. An individual's temporary refusal to comply with an officer's commands is not in itself a valid basis for an arrest. *Mackinney v. Nielsen*, 69 F.3d 1002, 1005–06 (9th Cir. 1995). Nor is an individual's peaceful, verbal challenge to police action a valid basis. *Id.* at 1006–07 (noting that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state" (quoting *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987) (alteration in original)). Furthermore,

once the officers confirmed that the item in G.S.'s hands was a toy, they no longer had any reason to believe that Sialoi Sialoi Jr.—or in fact any of the family members—was engaged in the criminal activity that the apartment manager reported. Accordingly, taking the facts in the light most favorable to Sialoi Sialoi Jr., the officers arrested him without probable cause, thereby violating his constitutional rights.

2. *Whether the constitutional right was clearly established*

As with the three teenagers, the background circumstances on which the defendants rely to establish qualified immunity (the officers presence in a high-crime area) do not make it even "reasonably arguable" that probable cause existed to arrest Sialoi Sialoi Jr. Nor does Sialoi Sialoi Jr.'s initial response to the officers' instructions. *See Mackinney*, 69 F.3d at 1005–07. We therefore hold that no reasonable officer would have thought it lawful to arrest Sialoi Sialoi Jr., and we affirm the district court's denial of qualified immunity for his arrest.

*C: The Officers' Seizure of the Remaining Plaintiffs*

1. *Whether the seizure violated the rights of the remaining plaintiffs*

The remaining plaintiffs were either patted down, handcuffed, and ordered to stand in the middle of the apartment complex's parking lot, or, in the case of those plaintiffs initially inside the apartment, seized when they came outside but not handcuffed. Unlike the three teenagers and Sialoi Sialoi Jr., none of the remaining plaintiffs was placed in the back of a police car. Nevertheless, the officers'

conduct toward some, if not most, of these plaintiffs likely amounted to an arrest. We need not decide, however, with respect to each individual plaintiff whether the officers' tactics were sufficiently intrusive to rise to that level of seizure because we hold that the officers lacked even reasonable suspicion to detain and search the remaining plaintiffs.[3]

An investigatory detention is unlawful unless supported by reasonable suspicion. *Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011). Although less stringent than probable cause, reasonable suspicion nevertheless requires that officers "have 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *Id.* (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)); *see also United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2001) ("[R]easonable suspicion may not be 'based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.'").

Taking the facts in the light most favorable to the remaining plaintiffs, the officers had no "specific, articulable facts" that would form the basis for reasonable suspicion to

---

[3] Because the reasonable suspicion standard required to detain a suspect is less stringent than the probable cause standard needed to justify an arrest, *see Alabama v. White*, 496 U.S. 325, 330 (1990), our holding that the facts do not establish reasonable suspicion necessarily means that they are insufficient to establish probable cause as well. However, our conclusion in this section in no way precludes the plaintiffs from arguing to the jury, and prevailing on, the theory that the officers' actions with respect to the remaining plaintiffs amounted to an arrest.

detain the other plaintiffs. In no way did the remaining plaintiffs fit the description of the suspects in the apartment manager's report. None was a black adult male (in fact, many of them were not even *males*), and none was wearing a brown T-shirt or a long-sleeved T-shirt with a hood. They were not ducking around the apartment complex suspiciously but instead barbecuing, singing songs, and eating cake at a young child's birthday party. The defendants nonetheless argue that the remaining plaintiffs' presence "at night [in] an area known for criminal activity" and their "proximity" to the three teenagers offered a basis for detaining them. By the time the officers detained the remaining plaintiffs, however, the officers knew that their proximity to the three teenagers was innocuous because the officers had already determined that none of the boys possessed a weapon and had no reason to suspect that they were otherwise engaged in any unlawful conduct. Furthermore, the Sialoi family's presence in a high-crime area cannot serve as the basis for detaining them, because it merely "cast[s] suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *Sigmond-Ballesteros*, 285 F.3d at 1121.

The officers also argue that the remaining plaintiffs were "agitated" and "display[ed] growing hostility." Not only is this contention inconsistent with the plaintiffs' version of the events, it also conflicts with the officers' own description of the encounter. The officers in charge at the scene testified that, aside from Sialoi Sialoi Jr.'s brief refusal, everyone complied with the officers' demands. (Sergeant Sluss deposition: "Q. So everybody complied with your order? A. Yes"); (Officer Doeden deposition: "Q. Was there anybody that night that did not comply with the command of an officer that you were aware of? A. Not that I saw."). In fact, nothing

in the record as a whole—let alone when taking the facts in the light most favorable to the non-moving parties—suggests that the remaining plaintiffs acted aggressively toward the officers so as to justify their detention.

In sum, the officers had no basis for concluding that the gathered plaintiffs had anything to do with the events portrayed in the apartment manager's report, and nothing the remaining plaintiffs did once the officers arrived offered any basis for detaining them.

The remaining plaintiffs challenge not only the officers' decision to detain them but also their decision to frisk them for weapons. Incident to a valid investigatory stop, an officer may, consistent with the Fourth Amendment, "conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that 'the persons with whom he is dealing may be armed and presently dangerous.'" *I.E.V.*, 705 F.3d at 434 (quoting *Terry*, 392 U.S. at 30). This interest in the safety of the officers and others nearby is the "sole justification" for a *Terry* frisk. *Id.* at 435 (internal quotation marks and emphasis omitted). Here, for the reasons set forth in the previous paragraph, the officers' detention of the remaining plaintiffs was unlawful under the plaintiffs' version of the events. For this reason, any search incident to that detention necessarily is as well. *See id.*

We also hold that, taking the facts in the light most favorable to the remaining plaintiffs, their search was unlawful for another reason. Even if, contrary to our conclusion, the officers did have reasonable suspicion to initiate a detention of the remaining plaintiffs, the officers still had no basis to search them for weapons. The defendants attempt to justify these frisks on the basis that they were

necessary to find and secure the "second" gun described in the earlier report to the police. In so arguing, the defendants fail to take the facts in the light most favorable to the remaining plaintiffs. They ignore the fact that the officers had no reason to suspect that they would find a "second" gun amongst the Sialoi family because the item in G.S.'s hand could not possibly have been the "first" gun; it was a mere toy in the hands of someone who in no way matched the description of the suspects. Moreover, even if, contrary to the remaining plaintiffs' version of the events, the officers had not immediately discovered that the ostensible weapon was a mere toy, the officers had no reasonable basis to expect to find the "second" gun, which was *a shotgun*, hidden on the body of one of the remaining family members.[4] Because no officer could have reasonably believed that any of the remaining plaintiffs might have a concealed weapon, we hold that the frisks violated the Fourth Amendment.

   2. *Whether the constitutional right was clearly established*

We hold that, taking the facts in the light most favorable to the remaining plaintiffs, no reasonable officer would have thought it lawful to detain and search them. The defendants do not dispute that it has long been clearly established that it is unlawful to conduct an investigatory stop and search unsupported by reasonable suspicion. *See, e.g.*, *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009). Once the officers discovered that the item in G.S.'s hand was a mere toy, the only fact that in any way suggested that the Sialoi family was involved in criminal activity was the sole

---

[4] One might wonder, for instance, where exactly on her body the officers believed that thirteen-year-old T.A.S. was hiding a shotgun.

circumstance of their presence outside an apartment building near which two armed suspects had earlier been spotted. Were this sufficient to establish reasonable suspicion, the police would be authorized to indiscriminately detain individuals in areas of expected criminal activity without any "basis for suspecting that the *particular* person detained is engaged in criminal activity." *Liberal*, 632 F.3d at 1077 (emphasis added). Accordingly, no reasonable officer would think that the location of the encounter alone could serve as the basis for reasonable suspicion. Furthermore, because the officers do not "allege[] any specific facts" suggesting that any of the remaining plaintiffs possessed a weapon, "we conclude that it would have been clear to a reasonable officer that [the] pat-down[s] . . . [were] unlawful in this situation." *Ramirez*, 560 F.3d at 1022–23. Accordingly, we affirm the district court's denial of qualified immunity for the officers' seizure and search of the remaining plaintiffs.

## D: The Search of the Sialois' Apartment

1. *Whether the search violated the Sialois' constitutional rights*

It is clear that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted). Here, the officers first attempt to justify the search of the Sialois' apartment on the theory that it was lawful under *Maryland v. Buie*, 494 U.S. 325 (1990), as a warrantless "protective sweep" of the Sialoi apartment

incident to the arrest of G.S.[5]  *Id.* at 334.  *Buie* is inapplicable, however.  There, officers possessed a valid arrest warrant that authorized them to enter the suspect's residence.  494 U.S. at 330.  The issue in *Buie* was not whether the officers could enter the residence but instead whether, having obtained judicial authorization to enter the home, the officers were justified in continuing to search it after they had arrested the target of the arrest warrant.  *Id.*  *Buie* thus offers no independent justification for entry of a residence, but only addresses the question of what the police may do once lawfully inside.  *See United States v. Flippin*, 924 F.2d 163, 165 (9th Cir. 1991) (noting that the "protective search was upheld in *Buie* because the police had a legitimate right to enter the home").

Moreover, even if *Buie* applied to the situation before us, the facts in the light most favorable to the plaintiffs do not suggest that the apartment "harbor[ed] an individual posing a danger to those on the arrest scene."  *Buie*, 494 U.S. at 334.  This is so for the same reasons that we have stressed repeatedly in this opinion.  The officers had no basis for believing that a dangerous individual was amongst the Sialois because, at the time of the protective sweep, the officers had already detained everyone present under heavily-armed police guard, and had determined that no one at the birthday party was engaged in any criminal activity at all.

---

[5] Under *Buie*, officers can perform a "protective sweep" incident to an arrest inside a residence if they possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene.'"  494 U.S. at 334.

Next, the defendants attempt to justify the search on the basis of the exigency exception to the warrant requirement, which permits "warrantless entry where officers 'have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009)). The defendants argue that the officers had probable cause to enter the Sialois' apartment to find that oft-referenced "second gun." But this argument is easily answered in the same manner as the defendants' argument about the seizure and search of the assembled members of the Sialoi family. No probable cause existed to believe that anyone connected with the Sialois possessed the "second gun" because the officers knew, before searching the Sialois' apartment, that G.S.'s toy could not have been the "first gun" described in the call to the police, and there was no other reason at that time to suspect that any of the Sialois had taken part or were taking part in any unlawful activity. We therefore hold that the search of the Sialoi apartment violated their constitutional rights.

## 2. *Whether the constitutional right was clearly established*

Finally, we conclude that no reasonable officer would have thought it lawful to search the Sialois' apartment. The defendants argue that the "one to two minute[]" search of the apartment was not unreasonable. It was clearly established at the time of the incident, however, that when officers arrive at a residence and find "no evidence of weapons, violence, or

threats," that warrantless entry into that residence is unreasonable, regardless of the duration. *Sandoval*, 756 F.3d at 1165.**[6]** Accordingly, we affirm the denial of qualified immunity for the officers' entry and search of the Sialois' apartment.

## IV

Taking all the facts in the light most favorable to the plaintiffs, the defendants are not entitled to qualified immunity, and the district court properly denied their motion for summary judgment.

**AFFIRMED**.

---

**[6]** Although *Sandoval* was published in 2014, it addresses alleged civil rights violations that occurred in October 2009, a year prior to the incident at issue in this case. 756 F.3d at 1158. Thus, *Sandoval*'s discussion of clearly established law applies equally here.