**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEPHEN DOUGLAS HILL;
TERESA ANN HILL; BENJAMIN
HILL, as guardian ad litem for his
minor children C.H. and A.H.; BRETT
MICHAEL HILL,
     *Plaintiffs-Appellants,*

  v.

CITY OF FOUNTAIN VALLEY;
STUART R. CHASE; GANNON P.
KELLY; JAMES CATALINE,
     *Defendants-Appellees,*

 and

DOES, 1-10, inclusive,
     *Defendant.*

No. 21-55867

D.C. No.
8:20-cv-00705-
DOC-DFM

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted October 3, 2022
Pasadena, California

Filed June 1, 2023

Before:  A. Wallace Tashima and Kenneth K. Lee, Circuit Judges, and Nancy D. Freudenthal,[*] District Judge.

Opinion by Judge Lee;
Partial Concurrence and Partial Dissent by Judge Tashima

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment for police officers in an action brought pursuant to 42 U.S.C. § 1983 alleging violations of plaintiffs' Fourth Amendment rights against warrantless arrests and excessive force.

Police responded to a 911 call that a Ford Mustang was darting erratically in the streets.  Behind the wheel was a young white male, along with a blindfolded female in the car.  With the aid of the car's license plate number provided by the caller, police officers figured out the home address of the driver.  In reality, the driver, Benjamin Hill, was taking his wife for a "surprise" anniversary dinner.  When officers arrived at the home that Benjamin shared with his parents and before the mix-up could be cleared, the officers ordered Benjamin's parents, Stephen and Teresa, and brother, Brett,

---

[*] The Honorable Nancy D. Freudenthal, United States District Judge for the District of Wyoming, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

out of their home for obstructing the police and pushed Stephen to the ground as they handcuffed him.

The panel rejected plaintiffs' contention that the police officers violated their Fourth Amendment rights against unreasonable seizure when the officers ordered them to exit the home or face arrest for obstruction. The officers never seized Brett or Teresa, who did not submit to the officers' demand to leave the home. They therefore could not claim that they were unlawfully arrested. The panel next held that while the officers did not have probable cause to arrest Stephen for obstruction of justice, they were nevertheless shielded by qualified immunity. The panel noted that although it is well established under California law that even outright refusal to cooperate with police officers cannot create adequate grounds for police intrusion without more, here there was no clearly established law that the officers could not arrest Stephen, given his evasive behavior that appeared to interfere with an urgent investigation into a potential kidnapping.

The panel held that Stephen's excessive force claim failed because he suffered only a minor injury when pushed to the grassy lawn during a tense encounter. Finally, Stephen's First Amendment retaliation claim did not pass muster because he presented no evidence that the officers arrested him because of his mild questioning of the officers.

Concurring in part and dissenting in part, Judge Tashima agreed with the majority's decision to affirm the dismissal of the excessive force and First Amendment retaliation claims. Judge Tashima would reverse the dismissal of Stephen's unlawful seizure claim because clearly established precedent prohibited the officers from making the warrantless arrest at Stephen's home, when they did not

have probable cause, there were no exigent circumstances and it was clearly established, among other things, that at the time "even an outright refusal to cooperate with police officers" did not justify a warrantless arrest for a violation of California Penal Code § 148.

## COUNSEL

Brenton W. Aitken Hands (argued) and Jerry L. Steering, Law Offices of Jerry L. Steering, Newport Beach, California, for Plaintiffs-Appellants.

Colin R. Burns (argued), Harper & Burns LLP, Orange, California, for Defendants-Appellees.

# OPINION

LEE, Circuit Judge:

At around nine o'clock in the evening, a concerned citizen called 911 to report a Ford Mustang darting erratically in the streets. Behind the wheel was a young white male, along with a blindfolded female in the car. With the aid of the car's license plate number provided by the caller, Fountain Valley police officers figured out the home address of the driver and raced to that house.

But this was not an ongoing kidnapping. In reality, the driver, Benjamin Hill, was taking his wife for a "surprise" anniversary dinner. And his parents would soon experience a surprise of their own, as the police officers descended upon the home that they shared with their son. Before this mix-up could be cleared, the police officers ordered the Hills out of their home for obstructing the police and pushed the father to the ground as they handcuffed him. The Hills later sued, alleging (among other things) violations of their Fourth Amendment rights against warrantless arrests and excessive force.

We affirm the district court's summary judgment for the police officers. First, while the officers did not have probable cause to arrest Benjamin Hill's father for obstruction of justice, they are shielded by qualified immunity. There was no clearly established law that they could not arrest him, given his evasive behavior that appeared to interfere with an urgent investigation into a potential kidnapping. Second, his excessive force claim fails because he suffered only a minor injury when pushed to the grassy lawn during a tense encounter. Finally, his First Amendment retaliation claim does not pass muster because

he presented no evidence that the officers arrested him because of his mild questioning of the officers.

## BACKGROUND

### I.          The events of April 30, 2019.

On the night of April 30, 2019, a comedy of errors cascaded into an ordeal for the Hill family.  That night, Benjamin decided to take his wife for a "surprise" anniversary dinner.[1]  As he drove her to the restaurant, someone called 911 to report  a "dark grey Ford Mustang" being driven "erratically" by a black-haired white male between the age of twenty-five and thirty.  The caller also ominously noted a blindfolded female passenger.

Based on the license plate number provided by the 911 caller, Fountain Valley police officers learned that the car belonged to Benjamin and obtained his home address. Officers Stuart Chase and Gannon Kelly then drove to Benjamin's home to "check the well-being" of the passenger.

Shortly after the officers arrived at the residence, Teresa—Benjamin's mother—pulled into the driveway. The officers asked her whether Benjamin lived there and drove a grey Mustang.  Teresa answered yes to both questions and told them that Benjamin was not home.  But when the officers asked for Benjamin's phone number, she balked.  She later admitted that she stopped cooperating with the police because she wanted to warn her son about the officers before they had a chance to call him.

---

[1] Because this case involves several members of the Hill family, we will refer to the individuals by their first name for clarity's sake.

While the officers talked to Teresa, Stephen—Benjamin's father—exited the home to help bring their grandchildren into the house.  The officers told the couple that they were investigating a report of erratic driving, once again asking for Benjamin's phone number.  Then Teresa went inside with one of her granddaughters and tried to reach Benjamin.

Skeptical that the officers were only investigating erratic driving, Stephen demanded that the officers tell him "what was really going on."  The officers told him that they wanted to talk to Benjamin, citing the report of a blindfolded female passenger in his car.  Stephen responded that Benjamin was out with his wife and offered to pass along the officers' business cards.  The officers told Stephen to take his other granddaughter inside and to return with Benjamin's phone number.

While waiting outside, the officers noticed someone moving inside the house by the bedroom window.  Officer Chase then walked across the lawn to investigate further and saw a young male who matched Benjamin's description.  Believing this person to be Benjamin, Officer Chase told him to exit the house.  But the young male walked into a hallway, out of sight.  Then Stephen entered the bedroom.  Officer Chase asked Stephen, "Who's the other person here?"  Not hearing the question, Stephen closed the curtains, hoping to keep the officers' flashlights from disturbing his granddaughter.

The officers would later learn that the young man inside the house was not Benjamin but his brother, Brett.  But at the time, the officers suspected that Benjamin's parents were hiding him from law enforcement.  Through a window on the front door, the officers saw Teresa, Stephen, and an

unidentified male they suspected to be Benjamin. The officers checked to see if the door was locked. At this point, they told the unidentified male to exit the house. The officers then threatened to arrest all of them for obstruction if they did not leave the house, according to the Hills. The officers, however, dispute that they threatened to arrest Teresa.

Stephen stepped outside while Brett and Teresa remained inside. Stephen closed the door behind him and told the officers they could not come in. The parties dispute what happened next: Officer Kelly claims that he placed his foot in the doorjamb and Stephen closed the door on his foot; Stephen, on the other hand, claims that he never closed the door on Officer Kelly's foot. In any event, the officers immediately grabbed Stephen, led him to the front lawn, and brought him to the ground. While being brought to the grassy ground, Stephen's glasses cut him on the forehead. He also alleged neck and back injuries because Officer Kelly held Stephen down by kneeling on him. Several seconds after the officers led Stephen away from the front door, Brett and Teresa left the house to check on Stephen.

## II.     The Hills' lawsuit against Fountain Valley police officers.

The Hills sued the officers under 42 U.S.C. § 1983 for excessive force on behalf of Stephen, unreasonable seizure on behalf of all the Hills (including the two grandchildren), and First Amendment retaliation on behalf of Stephen. The Hills also brought state-law claims for battery, assault, and a violation of Cal. Civ. Code § 52.1 on behalf of Stephen, along with state-law claims for false arrest and intentional and negligent infliction of emotional distress on behalf of all the Hills.

The officers moved for summary judgment. The district court remanded the state law false arrest claim to state court and granted summary judgment to the officers on all the other claims.

The district court rejected Stephen's Fourth Amendment excessive force claim, concluding that the government's interest in using force outweighed the slight intrusion into Stephen's Fourth Amendment interests. This result also meant that the battery, assault, and § 52.1 claims could not survive summary judgment.

Next, the district court considered the Hills' Fourth Amendment unreasonable seizure claims. The district court found that Stephen and Brett were the only ones seized. Because they were seized in the home and without a warrant, the police officers needed exigent circumstances and probable cause to arrest them. The district court found that the officers faced exigent circumstances and that they had probable cause for Brett's arrest. Although the district court found no probable cause for Stephen's arrest, it held that qualified immunity applied. The district court remanded the false arrest claim (which is coextensive with an unreasonable seizure claim) because federal qualified immunity does not apply to that state-law claim.

The district court also granted summary judgment on the First Amendment retaliation claim because Stephen could not show that retaliatory animus was the but-for cause of his arrest. Finally, it granted summary judgment on the intentional and negligent infliction of emotional distress claims, ruling that the Hills did not suffer severe emotional distress.

The Hills timely filed this appeal.

**STANDARD OF REVIEW**

We review de novo a district court's grant of summary judgment. *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

**DISCUSSION**

**I.      The Hills fail to establish liability for their Fourth Amendment unreasonable seizure claims.**

Brett, Teresa, and Stephen maintain that the police officers violated their Fourth Amendment right against unreasonable seizure when the officers ordered them to exit the home or face arrest for obstruction. *See Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002); *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1990). We disagree. The officers never seized Brett or Teresa, so they cannot claim that they were unlawfully arrested. And while the officers likely lacked probable cause to arrest Stephen, they are shielded by qualified immunity.[2]

**A.  The officers did not seize Brett or Teresa.**

Before assessing whether an unlawful arrest occurred, we must determine who—if anyone—the officers seized. A seizure occurs when there is "*either* physical force . . . *or*,

---

[2] The district court reasoned that the officers did not seize Teresa because their order to exit the house was not directed at her. The district court also held that Brett was seized but that the officers did not violate the Fourth Amendment when they arrested him. As explained, we rely on different grounds to find no Fourth Amendment violation.

where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (alteration in original). Put another way, if a plaintiff did not comply with an officer's orders, then the officer did not seize the plaintiff. *Id.* at 629. Indeed, the officer's show of authority must cause the plaintiff's submission. *See id.* at 628 (citing *Brower v. Inyo Cnty.*, 489 U.S. 593, 596 (1989)).

We hold that the officers did not seize Brett and Teresa because they did not submit to the officers' show of authority.[3] Under the threat of arrest, the officers demanded that "you guys" come out of the house. Stephen complied and exited the home. *See Hodari D.*, 499 U.S. at 626. In contrast, Brett and Teresa stayed inside and locked the door behind Stephen. It was not until after the officers restrained Stephen and began leading him to the lawn that Brett and Teresa left the home. In short, they did not submit to the officers' demand to leave the home and left the house only in response to Stephen's arrest. We thus conclude that Brett and Teresa were not seized and they cannot pursue their Fourth Amendment claims.

## B. Assuming the officers seized Stephen, their actions are protected by qualified immunity.

Turning to Stephen, we hold that the qualified immunity applies to the officers' alleged warrantless in-home arrest.[4]

---

[3] The Hills also argue that the two grandchildren were seized. But there is no evidence that the grandchildren were ordered out of the home or that they submitted to any show of authority.

[4] The parties dispute whether the police officers arrested or merely detained Stephen. We need not address this question because, even assuming Stephen was arrested, the officers are not liable because of qualified immunity.

Law enforcement can make a warrantless in-home arrest if the officers faced exigent circumstances and had probable cause supporting the arrest. *Payton v. New York*, 445 U.S. 573, 589–90 (1980). We hold that the officers likely did not have probable cause to arrest Stephen for obstruction, even if there were exigent circumstances. But qualified immunity still shields the officers from liability because there was no clearly established law at the time forbidding their actions.

A lawful arrest requires officers to have probable cause. Probable cause exists where the "available facts suggest a fair probability that the suspect has committed a crime." *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006). When assessing probable cause, courts must consider the totality of the circumstances known to the officers at the time.

To start, we note that the officers waived the argument that they had probable cause to arrest Stephen for kidnapping or aiding and abetting a kidnapping. *In re Mercury Int. Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) ("We apply a 'general rule' against entertaining arguments on appeal that were not presented or developed before the district court." (quoting *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir.1998))). Thus, the question is whether the officers had probable cause to arrest him for obstruction of justice under California state law. We hold that they likely did not.

"[I]t is well established under California law that even an outright refusal to cooperate with police officers cannot create adequate grounds for police intrusion without more." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1023 (9th Cir. 2015). Here, a jury could have reasonably found that Stephen's actions did not amount to an obstruction of justice.

California courts have held that passively blocking a door or refusing to open a door after a proper police demand are examples of permissible refusals to cooperate with police. *People v. Wetzel*, 520 P.2d 416, 419 (Cal. 1974); *People v. Cressey*, 471 P.2d 19, 23 n.6 (Cal. 1970). Because Stephen's actions resemble other lawful refusals to cooperate, the officers likely did not have probable cause to arrest him for obstruction of justice.

But that does not end our inquiry. Even if there is a violation, qualified immunity "shields government actors from civil liability . . . if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We have held that qualified immunity applies when it was objectively reasonable for an officer to believe he or she had probable cause to make the arrest. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011). "Framing the reasonableness question somewhat differently, the question in determining whether qualified immunity applies is whether all reasonable officers would agree that there was no probable cause in this instance." *Id.* at 1078 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Here, qualified immunity applies because not all reasonable police officers would believe that they lacked probable cause to make the arrest, especially given the urgency and unique facts here. True, this circuit has held that a suspect's refusal to cooperate—without more—can undermine qualified immunity for officers who seized the suspect. *See, e.g.*, *Mackinney v. Nielsen*, 69 F.3d 1002, 1006 (9th Cir. 1995) (denying qualified immunity where the alleged obstruction was underlining the last part of a chalk

message before complying with a police order to stop).  But those cases considered situations in which it was clear the plaintiff's action was not an obstruction, *id.*, the refusal was only verbal, *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir.1990), or the plaintiff was obstructing an unlawful police act, *Johnson v. Bay Area Rapid Transit*, 724 F.3d 1159, 1178 (9th Cir. 2013).  None of those facts apply here.

Our case presents a uniquely different situation. To begin, we must acknowledge that the specter of an ongoing kidnapping likely colored the officers' belief of whether an obstruction of justice occurred. The officers already had probable cause to arrest Brett because he matched the description of a suspect who appeared to have been engaging in a crime.[5]  *See United States v. Brooks*, 610 F.3d 1186 (9th Cir. 2010) (probable cause when the plaintiff matched a victim's description of the perpetrator's features, drove a similar vehicle to the perpetrator, and was found at the location where the perpetrator operated).  And the officers faced an exigent circumstance in investigating a potentially kidnapped woman who may be hidden in the Hills' home. *See United States v. Brooks*, 367 F.3d 1128, 1133, n.5 (9th

---

[5] The dissent lasers in on each piece of fact to argue that it alone cannot establish probable cause.  But we cannot view each fact in isolation, and instead must analyze all the facts under a totality of the circumstances, which means we must consider the "whole picture" that develops from the combined effect of all the available facts.  *See District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).  Every fact leading up to the arrest should serve as a factor in the totality of the circumstances, recognizing that the whole is often greater than the sum of the parts and that even seemingly innocent facts can suggest a crime is afoot.  *Wesby*, 138 S. Ct. at 588. And here, the police had multiple and specific pieces of evidence for probable cause (*e.g.*, a 911 call identifying the license plate and description of a driver with a blindfolded woman in the passenger seat).

Cir. 2004).    The officers thus may have believed that ordering the Hills outside would ensure the safety of a potential kidnapping victim. *See People v. Panah*, 107 P.3d 790, 836–37 (Cal. 2005); *see also Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (permitting entry into a home without probable cause when there was concern about an armed student and the police faced evasive behavior upon arriving at the home).

Further, Stephen's closing the curtains as Officer Chase asked a question about an unidentified young male's identity could have suggested obstruction into an investigation of a possible kidnapping.  Even worse, shutting window curtains can sometimes suggest that occupants are preparing "to do battle."  *United States v. Salvador*, 740 F.2d 752, 758 (9th Cir. 1984).

Given these unique facts and the urgency to act, we do not believe that "all reasonable officers would agree that there was no probable cause in this instance." *Rosenbaum*, 663 F.3d at 1076.  We generally want law enforcement to be proactive and persistent in investigating a potential ongoing kidnapping.  Of course, it turned out that the police officers here were mistaken.  But we are wary of second-guessing the split-second "judgments made by law enforcement officers in the heat of their battle against crime" from the certainty and comfort of our chambers.  *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002); *see also Hill v. California*, 401 U.S. 797, 804–05 (1971) (finding that officers acted reasonably based on the totality of the circumstances, including a good-faith, but ultimately mistaken, belief that they were arresting the correct suspect). In short, qualified immunity applies because the Hills have not offered any factually analogous case "clearly

establishing" that the officers' actions were unlawful under these circumstances.[6]  *Castro*, 833 F.3d at 1066.

## II.      The officers did not use excessive force to violate Stephen's Fourth Amendment right.

We review Stephen's excessive force claim under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989).   This "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).   The Supreme Court has provided an inexhaustive list of government interests that might justify an officer's use of force, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."   *Id.* (citing *Garner*, 471 U.S. at 8–9).   We also recognize that "police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly

---

[6] The dissent minimizes the unique nature of this case by saying that it is clearly established precedent that a warrantless in-home arrest is illegal when there is not probable cause and exigent circumstances.  But the Supreme Court has cautioned us, especially in the Fourth Amendment context, from reciting a general rule and using it to deny qualified immunity. *City of Escondido v. Emmons*, 139 S. Ct. 500, 503–04 (2019). Rather, "clearly established law" usually means there is a case "where an officer acting under similar circumstances was held to have violated the Fourth Amendment."  *Id.* at 504 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018)).  Stephen failed to cite such a case and instead tried to distinguish cases that, in fact, support the officer's efforts to investigate a potential kidnapping.  That cannot by itself deny qualified immunity.

evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

*Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001), highlights our fairly deferential review of law enforcement's use of force. In *Jackson*, this court held that police officers did not use excessive force during an arrest for obstruction involving a misdemeanor crime. *Id.* at 653. The officers pepper sprayed the plaintiff, tackled her, handcuffed her, and intentionally placed her in a hot patrol car. *Id.* at 652. But the court held that these actions were reasonable, given the government's interest of safeguarding the officers during a tense situation in which they were outnumbered. *Id.* at 653.

Stephen experienced only an inadvertent cut on his head from the take-down on the grassy lawn. These injuries are minimal compared to being tackled, pepper sprayed, and intentionally being held in a hot patrol car. *See id.* at 652. Further, Stephen's noncompliance occurred during an investigation into a potential kidnapping, a more severe offense than the misdemeanor in *Jackson. See Graham*, 490 U.S. at 396. Admittedly, while the situation at the Hills' home was tense and escalating, it was not as dangerous as that in *Jackson. See Jackson*, 268 F.3d at 653. Still, the balance of interests favors the government. We thus conclude that the officers did not violate Stephen's Fourth Amendment right against excessive force.

## III.     The officers did not violate Stephen's First Amendment right by retaliating against him.

A plaintiff can bring a First Amendment claim against government officials who retaliate for engaging in protected speech. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "To

prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Id.* (quoting *Hartman*, 547 U.S. at 259). Retaliatory animus must be the "but-for" cause of the plaintiff's injury. Put differently, a plaintiff must show that the arrest would not have happened without the retaliatory animus. *Id.* (citing *Hartman*, 547 U.S. at 260).

The Supreme Court has held that retaliatory arrest cases generally "present a tenuous connection between the defendant's alleged animus and the plaintiff's injury." *Reichle v. Howards*, 566 U.S. 658, 668 (2018). The reason is that an officer may bear animus toward a plaintiff's protected speech, but that same speech is often a legitimate consideration for officers when deciding to make an arrest. *See Nieves*, 139 S. Ct. at 1723–24 (citing *Reichle,* 566 U.S. at 668). Given this reality, the Court in *Nieves* held that the existence of probable cause defeats a retaliatory arrest claim. *Id.* at 1725 (citing *Hartman*, 547 U.S. at 260). If, however, the plaintiff establishes the lack of probable cause (like in our case), "then the *Mt. Healthy* test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation." *Id.* (alterations in original) (quoting *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1952–53 (2018)).

Stephen cannot overcome the *Mt. Healthy* requirement because he cannot show that retaliatory animus was a substantial factor behind his arrest. He maintains that asking the officers "what was really going on" and saying that he wanted to make sure "everything's on the up and up" had "perturbed the officers." But he has offered no evidence to

show that the officers were in fact perturbed. Indeed, it seems dubious that the officers would be upset because of benign statements such as "what was really going on"; law enforcement officers are routinely subjected to much more vitriolic rhetoric. *See Nieves*, 139 S. Ct. at 1735 (Ginsburg, J., concurring) (arguing that the plaintiff's claims should have been dismissed under *Mt. Healthy* because the only evidence of retaliation was an officer saying, "Bet you wish you would have talked to me now"). And even if the officers were "perturbed," no evidence suggests that they would not have arrested him absent those statements. The record suggests the officers arrested Stephen because they believed, though mistakenly, that he was hiding a suspect in a potential kidnapping case. *Id.*

## IV.   The district court did not err when it remanded or dismissed the Hills' state-law claims.

The district court did not err in dismissing Stephen's state-law claims for assault, battery, and a § 52.1 violation. All these claims have similar requirements as an excessive force claim. *See, e.g.*, *Cornell v. City & Cnty.. Of San Francisco*, 225 Cal. Rptr. 3d 356, 382 (Ct. App. 2017); *Koussaya v. City of Stockton*, 268 Cal. Rptr. 3d 741, 760–61 (Ct. App. 2020). And because his excessive force claim lacks merit, these state-law claims must fall by the wayside as well.

The district court also did not err in dismissing the Hill's claims for intentional and negligent infliction of emotional distress, which require "severe emotional distress." *Myung Chang v. Lederman*, 90 Cal. Rptr. 3d 758, 774 (Ct. App. 2009). The district court held that the Hills did not meet the high bar of "emotional distress of such a substantial quality or enduring quality that no reasonable person in civilized

society should be expected to endure it." *Hughes v. Pair*, 209 P.3d 963, 976–77 (Cal. 2009) (holding that discomfort, worry, anxiety, upset stomach, concern, and agitation did not establish severe emotional distress).

Finally, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the false arrest claim, which has similar requirements to an unreasonable seizure claim. *See Acri v. Varian Assocs.*, 114 F.3d 999, 1000 (9th Cir. 1997). As noted, we reject Stephen's Fourth Amendment unreasonable seizure claim on qualified immunity grounds, but California has not conferred a similar immunity for a false arrest claim. So while Stephen may be able to pursue that claim, he must do so in state court, as the district court did not abuse its discretion in concluding that exercising supplemental jurisdiction would not promote judicial economy, convenience, fairness, and comity here. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

## CONCLUSION

The Hills are understandably aggrieved by what happened to them. But the law protects good-faith mistakes by the Fountain Valley police officers investigating a potential kidnapping.

**AFFIRMED.**

TASHIMA, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's decision to affirm the dismissal of the excessive force and First Amendment retaliation claims. However, I would reverse the dismissal of Stephen's unlawful seizure claim because our clearly established precedent prohibited the officers from making the warrantless arrest at Stephen's home, when they did not have probable cause and there were no exigent circumstances. Because this law was clearly established at the time of the events here, the officers are not entitled to qualified immunity. The majority elides the strict requirements of the Fourth Amendment to protect the sanctity of the home, ignoring the basic requirements of a warrant and probable cause and relying on cases whose facts present circumstances so different from those faced by the officers here that they offer no support for the majority's grant of qualified immunity in the circumstances here. I therefore respectfully dissent from that part of the majority opinion.

This case is about a follow-up investigation of a citizen's report of seeing an erratically driven car on the freeway with a blindfolded female in the front passenger seat. There was no missing person report and no report that the woman appeared to be in distress – nothing more than this reported speculative observation. Thus, the purpose of the follow-up investigation was to determine whether probable cause existed that the crime of kidnapping was being committed. Admittedly, during the officers' investigation, there was no probable cause to believe that the crime of kidnapping had been or was being committed.

Even though the majority concludes that there was no probable cause to arrest Stephen, the opinion concludes that the officers are entitled to qualified immunity because the "urgency and unique facts here" meant that the officers reasonably believed they had probable cause to arrest Stephen for interfering with their investigation under California Penal Code § 148. However, it was clearly established at the time of the events here that "even an outright refusal to cooperate with police officers" does not justify a warrantless arrest for a violation of § 148. *Mackinney v. Nielsen*, 69 F.3d 1002, 1006 (9th Cir. 1995) (quoting *People v. Bower*, 597 P.2d 115, 122 (Cal. 1979)). It also was clearly established that, "in seeking to establish probable cause, 'officers may not solely rely on the claim of a citizen witness . . . , but must independently investigate the basis of the witness' knowledge or interview other witnesses.'" *United States v. Struckman*, 603 F.3d 731, 742 (9th Cir. 2010) (quoting *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001)). Moreover, the record is devoid of any facts that would establish urgency or exigent circumstances, as required by our precedent. Thus, no reasonable officer could have believed they had probable cause for the warrantless arrest of Stephen.

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)). It is, therefore, "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 749 (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). Stephen's arrest accordingly was presumptively

unreasonable, and the government bears the burden of overcoming the presumption. *Id.* at 750.

"To make a lawful entry into a home in the absence of a warrant, officers must have either probable cause and exigent circumstances or an emergency sufficient to justify the entry. These exceptions to the warrant requirement are 'narrow and their boundaries are rigorously guarded.'" *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009)). Both exceptions require the police to "show that a warrant could not have been obtained in time." *Id.* (quoting *Struckman*, 603 F.3d at 738). Probable cause "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)).

The majority's conclusion that the officers are entitled to qualified immunity fails on five independent grounds. First, the majority concedes that there was no probable cause to arrest Stephen, and probable cause is a requirement for a warrantless entry into a home. *Sandoval*, 756 F.3d at 1161. Second, the City has not met its "heavy burden" of showing specific, articulable facts justifying exigent circumstances. *Struckman*, 603 F.3d at 744; *United States v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000). Nor has the City shown that a warrant could not have been obtained in time. *Sandoval*, 756 F.3d at 1161. Moreover, in concluding that the officers are entitled to qualified immunity, the majority turns our summary judgment standard on its head, construing the facts and drawing all inferences in favor of the officers. Finally,

our clearly established law prohibited the officers from making a warrantless arrest in the circumstances here – inside a home where there was no reasonably trustworthy information establishing probable cause that a crime was being committed nor any specific, articulable facts establishing exigent circumstances. *Sialoi*, 823 F.3d at 1232; *see Sandoval*, 756 F.3d at 1161 ("Because it is 'clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances' or emergency, the officers are not entitled to qualified immunity unless their entry was justified by one of the two exceptions." (quoting *Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001))).

## I.        Probable Cause

The City waived the argument that the officers had probable cause to arrest Stephen for kidnapping or aiding and abetting a kidnapping. The City thus argues that there was probable cause to arrest *Brett* because he resembled the description of Benjamin and that Stephen interfered in their attempt to arrest Brett, resulting in probable cause to arrest Stephen for obstructing an investigation in violation of California Penal Code § 148. The majority concludes that the officers "likely did not" have not probable cause to arrest Stephen. Nonetheless, the majority concludes that the officers are entitled to qualified immunity because "not all reasonable police officers would believe that they lacked probable cause to make the arrest" under § 148. This conclusion is not supported by the record nor by our precedent.

The majority reasons that "[t]he officers already had probable cause to arrest Brett because he matched the description of a suspect who appeared to have been engaging

in a crime." The majority relies on Officer Chase's report that he saw Brett, who purportedly matched Benjamin's description, through the bedroom window, to find probable cause.[1] This conclusion is problematic for several reasons.

First, there were no facts or circumstances to support the conclusion that Benjamin "appeared to have been engaging in a crime." Probable cause requires "knowledge or reasonably trustworthy information," *Sialoi*, 823 F.3d at 1232, and an unconfirmed report that someone was driving a car with a blindfolded passenger does not establish probable cause that an offense was being committed. Our precedent makes clear that such a vague, speculative observation, without more, does not establish probable cause for a warrantless arrest, especially inside a home. Because there was no probable cause to arrest Benjamin, there was no probable cause to arrest Brett and certainly none to arrest Stephen.

Second, on summary judgment, the facts are construed and all reasonable inferences are drawn in the non-moving party's favor. *Mattos v. Agarano*, 661 F.3d 433, 439 (9th Cir. 2011) (en banc). The plaintiffs disputed whether Officer Chase was able to see Brett sufficiently to know he resembled the description of Benjamin, citing evidence that the window was blocked by trees, Brett did not enter the bedroom but merely passed by in the hallway, and Officer Chase stated, "See if that's a third person," which indicated that he could not see Brett sufficiently to conclude that he resembled Benjamin. Thus, construing, as we must, the facts in the plaintiffs' favor, Officer Chase could not have seen

---

[1] The district court relied on this report to support its finding of exigent circumstances.

Brett sufficiently to know that he resembled Benjamin, especially because his statement indicated that he was not even sure if he saw a third person.

The majority relies on *United States v. Brooks*, 610 F.3d 1186 (9th Cir. 2010), to support its conclusion that the officers had probable cause to arrest Brett, but in *Brooks*, the officers observed a minor engaged in prostitution and received specific descriptions of the suspects and their car from the victims of child sex trafficking. The officers knew that the suspects and their vehicle matched the descriptions given by the victims. Thus, there was "substantial correspondence between the officers' observations at the time of the arrest and the details that [the victim] had provided to the police concerning the crime, the individuals involved, their vehicle, and the location where the perpetrators operated." *Id.* at 1193. Unlike here, the officers had both first-hand knowledge and "reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense" was committed by the arrestees. *Sialoi*, 823 F.3d at 1232.

By contrast, the officers here received an unconfirmed report of a person driving a car with a blindfolded woman in the passenger seat, which is not a crime. There were no facts or circumstances indicating that an offense was being committed. Coupled with the fact that it is disputed whether the officers even saw Brett, through a window blocked by trees, it is clear that there was no reasonably trustworthy information establishing probable cause to arrest Brett. Thus, the record (and the case law) does not support the majority's statement that "[t]he officers . . . had probable cause to arrest Brett because he matched the description of a suspect who appeared to have been engaging in a crime."

Our precedent establishes that an unconfirmed, vague report that someone riding in the passenger seat of a car was blindfolded is insufficient to establish probable cause. For example, a neighbor's "very general" report that a man threw a backpack over a fence and climbed over the fence into the backyard while the owners were not home did not establish probable cause for arrest, even though the police confirmed that a person who fit the description was in the backyard. *Struckman*, 603 F.3d at 741–42.

Similarly, we found no probable cause for a warrantless search in *Hopkins*, where a witness reported that "she had been involved in an extremely minor car accident with" the suspect, "that she smelled alcohol on his breath, and that he appeared intoxicated." *Hopkins*, 573 F.3d at 767. We concluded that "these statements from a witness, without further investigation by the police, are insufficient to support probable cause," reasoning that the officers did not, for example, check to see if the car's hood was still warm, to corroborate the statement that the car had recently been driven, nor did they inspect the vehicle for any evidence of reckless driving or of alcohol consumption, such as open containers or an alcoholic odor." *Id.* "They did not ask [the witness] any questions in order to gain information beyond her cursory and conclusory statements . . . . In short, the officers obtained no information whatsoever beyond [her] brief statement." *Id.*

In contravention of our court's precedent, the officers here relied solely "on the claim of a citizen witness" – a brief, unverified report of a woman riding in a car blindfolded, which – unlike burglary, the purported offense in *Struckman*, and driving under the influence, the purported offense in

*Hopkins* – is not a crime.**[2]**  *Struckman*, 603 F.3d at 742.  Had the officers investigated further, perhaps they would have learned about Benjamin's surprise anniversary dinner for his wife.    The  vague,  unverified  report  is  not  close  to constituting   "knowledge   or   reasonably   trustworthy information" to establish probable cause.  *Sialoi*, 823 F.3d at 1232;  *see Hopkins*, 573 F.3d at 767 ("[S]tatements from a witness,  without  further  investigation  by  the  police,  are insufficient to support probable cause.").   Even construing the facts in the officers' favor, which is erroneous, and assuming  they  did  see  that  Brett  matched  Benjamin's description, the circumstances faced by the officers fell far short  of  even  those  in  which  we  have  found  no  probable cause.  There was no report of a missing person, nor did the unverified report state that the blindfolded woman was in any distress.   In short, there was nothing but an unverified claim of a citizen witness, which we have held may not be relied  upon  to  establish  probable  cause.[3]   *Struckman*, 603 F.3d at 742.

---

[2] Even if this unverified report were reasonably trustworthy, the officers knew that Stephen was not the person involved in the report.  There was therefore no probable cause to arrest Stephen.

[3] Contrary to the majority's suggestion, I do not "laser[] in on each piece of fact to argue that it alone cannot establish probable cause."   The majority forgets that the government bears a heavy burden in justifying a warrantless arrest in a home and that probable cause requires either *knowledge* or *reasonably trustworthy information* that an offense is being committed.  The majority can point to no evidence of either.  This is not a difficult case with unusual facts.  Examining the totality of the circumstances and construing the facts in the plaintiffs' favor, this is the information the officers had.  First, they received an unverified, vague report of a blindfolded woman passenger in a car, which under our precedent is insufficient to establish probable cause for arrest.  There was no  outstanding  missing  person  report.   When  the  officers  arrived  at

The complete lack of either knowledge or reasonably trustworthy information sufficient to lead a reasonably cautious person to believe that Brett was committing the offense of kidnapping means that there was no probable cause to arrest Brett.  Because there was no probable cause to arrest Brett, there certainly was no probable cause to arrest Stephen for violating § 148.  *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018–19 (9th Cir. 2015) (explaining that a defendant cannot be convicted under § 148 for resisting or obstructing a police officer if the officer unlawfully arrests someone without probable cause); *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1178 (9th Cir. 2013) ("A suspect cannot be arrested for violating § 148 because he evaded an officer's attempt to arrest him unlawfully.").

## II.     Exigent Circumstances

Not only was there no probable cause, but the circumstances here fall far short of establishing exigent circumstances.  "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries."  *Welsh*, 466 U.S. at 750.

---

Benjamin's home, his parents were reluctant to give them Benjamin's phone number until they confirmed that everything was "on the up and up."  Stephen told the officers that his infant granddaughter was in his truck, that he did not have Benjamin's cell phone number on him, and that he had left his own cell phone in the house.  The officers told him to take his granddaughter into the house.  He did so and closed the curtains in the bedroom.  One officer thought he saw a third person in the house.  The "combined effect" of all these facts is not sufficient to establish reasonably trustworthy information that an offense was being committed.

"When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." *Id.* (footnote omitted).

"The exigent circumstances exception is premised on 'few in number and carefully delineated' circumstances, in which '"the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Struckman*, 603 F.3d at 743 (first quoting *U.S. Dist. Ct.*, 407 U.S. at 318; and then quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Those circumstances are "(1) the need to prevent physical harm to the officers or other persons, (2) the need to prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a fleeing suspect; and (4) the need to prevent the escape of a suspect." *Id.* "The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances." *Id.* (quoting *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002)). "[C]onjecture about 'what may or might have happened' is insufficient to satisfy the government's 'heavy burden' of proving exigent circumstances." *Id.* at 744 (quoting *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987)). The unverified passing observation that a woman in a car appeared to be blindfolded is even less trustworthy than the information in our cases finding that there were no exigent circumstances. The officers therefore were bound by the strict rules governing the search of a home, its curtilage, and its occupants, in the absence of a warrant.

In *Struckman*, the neighbor's report of someone climbing over the fence into a backyard was confirmed by officers when they arrived and saw a person "*exactly matching* the informant's description – white man, black jacket, red backpack" in the backyard. *Sandoval*, 756 F.3d at 1162 (emphasis added). Yet, even with this confirmation, we concluded that no exigent circumstances to justify the warrantless arrest existed. *Struckman*, 603 F.3d at 746. *Struckman* stated that there was no "hot pursuit," nor any evidence to support "the government's suggestion that the general public was in danger" because there was "no evidence that anyone other than the officers and [the suspect] was near the fully enclosed backyard." *Id.* at 744. Nor did the evidence that the suspect removed his jacket "support an objectively reasonable basis for believing that the police officers' reaction – immediately drawing their firearms and entering the enclosed backyard – was necessary to prevent imminent physical harm to themselves." *Id.* We rejected the government's reliance on the officer's testimony that "once [the suspect] shed his jacket, he *believed* that [the suspect] *intended* to flee or fight the officers free of an encumbrance," stating that "an officer's subjective motivation for his actions is irrelevant in determining whether his actions are reasonable under the Fourth Amendment." *Id.*

Similarly here, although the district court purported to examine the officers' conduct from the perspective of an objectively reasonable officer, it relied on the officers' subjective motivation when it concluded that the officers *believed* that Stephen's shutting the curtains meant the occupants intended to "do battle." The district court relied on *United States v. Salvador*, 740 F.2d 752 (9th Cir. 1984), but in *Salvador*, the officers had evidence that the occupants

of the home were armed and had just robbed a bank. The majority repeats the error, relying on *Salvador* to speculate that "shutting window curtains can sometimes suggest that occupants are preparing 'to do battle.'" This wild speculation is unsupported by any evidence.

In *Salvador*, law enforcement was investigating the armed robbery of a credit union a few hours after the robbery occurred. An FBI agent tracked down the car used in the robbery to the residence, knocked on the door, and announced he was from the FBI. Someone asked who was there, and the agent stated that he wanted to speak with the occupants. He received no further response, so he knocked again and announced he was from the FBI. When he "saw the window curtains rapidly close and heard some commotion from within the residence," he "forced open the front door, believing the occupants were getting ready to 'do battle.'" *Id.* at 756.

In *Salvador*, the FBI had confirmed evidence that the occupants of the house were violent, armed, and had committed a felony. There are no articulable facts here that could possibly support the speculation that the occupants of the home were preparing to "do battle." The officers knew that Stephen and Teresa had gone into the house in order to take their grandchildren inside and get Benjamin's phone number.

Stephen's act of closing the curtains does not indicate that the warrantless arrest "was necessary to prevent imminent physical harm" to the officers. *Struckman*, 603 F.3d at 744. The Hills were inside the house with their grandchildren, and the officers were outside. There was no evidence that the officers or the general public were in danger. *See United States v. Nora*, 765 F.3d 1049, 1054–55

(9th Cir. 2014) (finding no immediate threat to the safety of officers or others to support exigent circumstances even though officers saw the suspect in possession of a handgun before he went into his house, stating that the suspect "never aimed the weapon at the officers or anyone else, and the officers had no evidence that he had used or threatened to use it" and had not "given any other indication that he was in 'an agitated and violent state'" (quoting *United States v. Al-Azzawy*, 784 F.2d 890, 894 (9th Cir. 1985))). There was no evidence here of a crime, a weapon, a violent threat, or anything else that might signal danger to the officers or the general public – merely a closed curtain.

At least in *Struckman*, the officers had confirmed the neighbor's report of someone climbing into the backyard. Here, there were no facts at all to support the suspicion of a possible kidnapping, merely "conjecture about 'what may or might have happened.'" *Struckman*, 603 F.3d at 744 (quoting *Howard*, 828 F.2d at 555).

The majority speculates that the officers "may have believed that ordering the Hills outside would ensure the safety of a potential kidnapping victim." The majority relies on *People v. Panah*, 107 P.3d 790 (Cal. 2005), in which the officers knew that an eight-year-old girl had been missing for five hours and that she had been seen talking to a man in the defendant's apartment when they conducted a warrantless search of his apartment. *Panah*'s facts are so different from those in this case that the opinion cannot support a finding of exigent circumstances here.

In *Panah*, the facts supporting a finding of exigent circumstances were that the girl "had been missing for several hours," "she had been seen talking to a male occupant of defendant's apartment, and a neighbor told [an

officer] a young male lived in defendant's apartment." *Id.* at 836. The California Supreme Court further noted that "the fact that the person missing was a child . . . heightened the exigency." *Id.* at 837.

In *Panah*, there was a confirmed report of a child who had been missing for numerous hours despite the police search of the apartment complex, and there was evidence that the defendant had been seen speaking to her. There were therefore "specific and articulable facts" establishing exigent circumstances to justify the warrantless search. *Struckman*, 603 F.3d at 743. There were none here. *Cf. Duran v. City of Douglas*, 904 F.2d 1372, 1377 (9th Cir. 1990) (finding no "legitimate, articulate reason" for a detention where there was no warrant, "no evidence of a danger to public safety," and no evidence the arrestee "was in possession of a controlled substance or had been or was about to be engaged in criminal activity").

The Supreme Court has explained that "[o]ur hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor." *Welsh*, 466 U.S. at 750. The underlying offense here was a purported violation of § 148, which not only is minor but is not sufficient on its own to justify a warrantless arrest. The City thus has not met its heavy burden of rebutting the presumption of unreasonableness.

## III.     Clearly Established Precedent

Despite concluding that the officers had no probable cause to arrest Stephen, the majority concludes that qualified immunity applies "because not all reasonable police officers would believe that they lacked probable cause to make the

arrest, especially given the urgency and unique facts here." The majority reaches its conclusion by calling the facts unique and thus concluding that we do not have any precedent addressing the situation. But every home is different, and every call to the police presents new circumstances. If all that was needed to justify a warrantless arrest was to call the situation unique, then every warrantless arrest would be justified and qualified immunity would always apply. The question is not whether we have precedent addressing the same facts, but whether a reasonable officer would know if the conduct was justified. Here, clearly established precedent controlled every aspect of the officers' conduct. Probable cause cannot be established by an unconfirmed report by a citizen witness, but instead requires specific knowledge or reasonably trustworthy information that an offense has been committed. *Sialoi*, 823 F.3d at 1233; *Struckman*, 603 F.3d at 741-42; *Hopkins*, 573 F.3d at 767. A warrantless arrest in a home is presumptively unreasonable, and the government bears the heavy burden of showing specific and articulable facts establishing that exigent circumstances made the situation so compelling that the warrantless arrest is reasonable. *Welsh*, 466 U.S. at 749; *Struckman*, 603 F.3d at 743. Refusal to cooperate with the police, without more, does not justify police intrusion. *Velazquez*, 793 F.3d at 1023; *Mackinney*, 69 F.3d at 1006. All of this was clearly established at the time of the events here.

One need only examine our precedent to see the variety of ways in which police officers encounter the public, and yet the officers are required to know the bounds of constitutional police conduct in each situation. For example, in *Sialoi*, an apartment manager called 911 to report two Black men, carrying guns and "ducking down around the

apartment complex, as if waiting for someone." *Sialoi*, 823 F.3d at 1228. When officers arrived, they encountered a Samoan family having a family birthday party, saw a teenager who held something that appeared to the officers to be a gun (although the officers were told it was a paintball gun), approached with guns drawn, and handcuffed and detained everyone at the party, including young teenagers. Examining the facts in the plaintiffs' favor, we held that there was no probable cause for the warrantless arrests because "[t]he police determined almost immediately" that the gun was a toy and none of the teenagers matched the description of the suspects. *Id.* at 1232. We rejected the defendants' argument that the warrantless arrests were reasonable because "the officers found themselves in a potentially dangerous situation," explaining that "[w]here no facts specific to the arrestees establish probable cause, officers may not rely on general background facts to immunize themselves from suit." *Id.* at 1233.

Nor were the officers' actions reasonable in *Hopkins*, where someone reported to the police that she had been in a hit-and-run accident, followed the driver to his house, and suspected that the driver had been drinking. The officers arrived at the driver's house, interviewed the witness, knocked loudly on the front door, and announced that they were police officers. After receiving no response, the officers speculated that the driver was in a diabetic coma and, based on this "potential medical emergency," broke into the house, handcuffed, and arrested him. *Hopkins*, 573 F.3d at 761. We held that the citizen witness statement, without more, was insufficient to establish probable cause, and the "investigation of a potential misdemeanor drunk-driving incident" did not create an exigent circumstance to support the warrantless entry. *Id.* at 767–69, 771. Because the

officers clearly violated the plaintiff's Fourth Amendment rights, the question was whether the contours of the emergency or exigency exceptions to the warrant requirement were clearly established at the time of the events. *Id.* at 770–71. We "unhesitatingly conclude[d] that a reasonable officer would indeed have known that the emergency exception to the Fourth Amendment would not encompass a warrantless entry into a home based solely on statements from a third party that an individual inside the home appeared inebriated prior to entering the residence." *Id.* at 771. There was "no doubt" that the law prohibiting the warrantless arrest in the home similarly was clearly established at the time and "thus should have been known by a reasonable officer." *Id.* at 774.

The majority criticizes me for relying on too general a rule in finding clearly established precedent. However, as illustrated by *Sialoi* and *Hopkins*, because of the variety of factual situations police encounter, we do not require cases with the same facts in order to find clearly established precedent. *See also*, *e.g.*, *Sandoval*, 756 F.3d at 1165 (officers who responded to report of two white males jumping a fence and looking through windows of a house in a neighborhood with recent burglaries, peered into a window of a home, saw three young males, entered the home, handcuffed, and detained them, were not entitled to qualified immunity); *Johnson*, 724 F.3d at 1173–81 (where officers responding to a report of a fight in a train encountered a group of people fitting the description of the alleged combatants, handcuffed, and arrested them, the district court properly denied qualified immunity on unlawful arrest claims); *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1074–79 (9th Cir. 2011) (per curiam) (where police received complaint that someone was selling free promotional tickets

to a state fair, and arrestee admitted to selling the tickets, police unreasonably believed they had probable cause to arrest him for obtaining money by fraud or for "collecting for benefit without authority"); *cf. Velazquez*, 793 F.3d at 1023 (where officers received a call regarding a disturbance at a home and found eight to ten people allegedly drinking and being loud across the street, reversing district court's ruling that a reasonable jury could not have found the officer lacked probable cause to arrest for a violation of California Penal Code § 148).

Our caselaw thus does not require that clearly established precedent address the same factual situation. To the contrary, we consider whether clearly established precedent established constitutional principles that the officers should have known applied to the situation. *See*, *e.g.*, *Sandoval*, 756 F.3d at 1165 (holding that officer was not entitled to qualified immunity because "it was clearly established law as of 2009 that the warrantless search of a dwelling must be supported by either the exigency or the emergency aid exception"); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008."); *Maxwell v. County of San Diego*, 708 F.3d 1075, 1083–84 (9th Cir. 2013) (stating that, "[a]lthough detention of witnesses for investigative purposes can be reasonable in certain circumstances, such detentions must be minimally intrusive," and that sheriffs accordingly were "on notice" that "they could not detain, separate, and interrogate" witnesses for hours); *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1074 (9th Cir. 2012) ("Although there is no case in our circuit with the same facts as those presented here, a reasonable official in [the assistant police chief's] position

would have known that it was unlawful to retaliate against an employee for providing subpoenaed deposition testimony in connection with a civil rights lawsuit alleging government misconduct."). As the Supreme Court has explained, "officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in [*United States v. Lanier*, 520 U.S. 259 (1997)], we expressly rejected a requirement that previous cases be 'fundamentally similar.'" *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). There can be "notable factual distinctions" between the precedent and the case before the court, "so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Lanier*, 520 U.S. at 269; *see Maxwell*, 708 F.3d at 1083 ("'[I]n an obvious case, [general] standards can "clearly establish" the answer, even without a body of relevant case law.'" (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

"This is not a case where courts disagree about the contours of a constitutional right or where officers may be confused about what is required of them under various circumstances." *Rosenbaum*, 663 F.3d at 1079. There is no question that a warrantless arrest in a home requires either probable cause and exigent circumstances or an emergency, and that both these exceptions are narrow. No reasonable officers could be confused about what is required of them when they approach residents inside their home, based solely on a vague, unconfirmed observation, and without a warrant.

This case is unlike *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018), in which the court of appeals denied the officers qualified immunity for false arrest based on a rule that "was not clearly established because it was not 'settled law.'" *Id.* at 591 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam)). The Court reversed, reasoning

that the lower court "relied on a single decision" in an area of unsettled law and that the officers therefore "could have interpreted the law as permitting the arrests." *Id.* at 591, 593. By contrast, none of the circumstances here presented issues of unsettled law. The rules governing warrantless arrests in a home, for a violation of § 148, based solely on an unconfirmed citizen report, clearly prohibited the officers' conduct here.

Failure to cooperate with the officers' investigation was the only possible offense that the City offered as a justification for Stephen's warrantless arrest, and the majority attempts to rely on this as well, stating that Stephen's "evasive behavior . . . appeared to interfere with a urgent investigation." However, as the majority acknowledges, "[i]t is well established under California law that even 'an outright refusal to cooperate with police officers cannot create adequate grounds for [police] intrusion' without more." *Velazquez*, 793 F.3d at 1023 (quoting *Mackinney*, 69 F.3d at 1006). The majority nonetheless concludes that a reasonable police officer could believe there was probable cause to arrest Stephen for a violation of § 148 because in several Ninth Circuit cases, "it was clear the plaintiff's action was not an obstruction," "the refusal was only verbal," or "the plaintiff was obstructing an unlawful police act," and that these facts were not present here.[4] But this is not the standard. *See Mackinney*, 69 F.3d

---

[4] The record does not support the majority's conclusion that those facts were not present here. What did Stephen do? He told the officers he wanted to ensure that everything was "on the up and up" before giving them Benjamin's phone number. He told them that his infant granddaughter was in his truck, that he did not have Benjamin's cell phone number on him, and that he had left his own cell phone in the house. The officers told him to take his granddaughter into the house.

at 1006 (explaining that, "in *People v. Cressey*, 2 Cal. 3d 836, 841 (1970), the California Supreme Court stated that the refusal to open a door upon a *proper* police request, was not a violation of § 148," even though "the defendant never did capitulate"). The law is clear that even an outright refusal to cooperate is not sufficient, and, even if it were true that these factual distinctions exist, the precedent was clearly established at the time of the events here.

Nearly fifty years ago the California Supreme Court held that a warrantless arrest in a person's home for obstructing a police investigation is unconstitutional. *People v. Wetzel*, 520 P.2d 416 (Cal. 1974). In *Wetzel*, the police officers received confirmation of a citizen informant's report of a burglary, and the informant then provided them with fresh information that proved to be reliable. Because the citizen's report had been confirmed, the officers were in hot pursuit of the burglary suspect and thus did not need a search warrant to enter an apartment they thought the burglar had entered. However, the occupant of the apartment refused to allow the officers to enter, telling "the officers to 'Get the hell out of here if you don't have a damn warrant.'" *Id.* at 417. She stood in the doorway and "remained adamant," even though the officers threatened her "with arrest for obstructing an officer in carrying out his duties." *Id.* at 418. The officers arrested her for obstruction of their investigation. The California Supreme Court held that her refusal to consent to the request to enter her apartment "cannot constitute grounds for a lawful arrest or subsequent search and seizure." *Id.* at 419.

---

He did so and closed the curtains in the bedroom. None of this conduct establishes probable cause to arrest Stephen for a violation of § 148.

In *Wetzel*, the police were in hot pursuit and thus "were clearly correct in their assertion that they did not need a search warrant" to enter the apartment. *Id.* at 418. Not only that, but, unlike here, the officers had confirmation of the citizen informant's report. Also unlike here, the arrestee expressly refused to cooperate with the police. Yet, the court held that the arrest was unlawful. *Id.* at 420.

Thus, as early as 1974, it was clearly established in California that the refusal to allow entry to police officers, even in hot pursuit of a suspect in a confirmed report of an offense, did not justify an arrest under § 148. *See Mackinney*, 69 F.3d at 1005–06, 1010 (holding that officers who arrested the suspect was not entitled to qualified immunity because "the officers had no grounds on which to arrest [him] other than his [purported] disobedience, which is insufficient"). By contrast, here, there was no confirmation of the citizen informant's report, and the Hills did not blatantly refuse to cooperate as in *Wetzel*. *Wetzel* establishes that no reasonable officer could have believed there was probable cause to arrest Stephen for a violation of § 148. *See Cressey*, 471 P.2d at 23 n.6 ("If refusal of permission to enter could convert mere suspicion of crime into probable cause to arrest the occupant and search his home, such suspicion alone would become the test of the right to enter, and the right to be free from unreasonable police intrusions would be vitiated by its mere assertion." (quoting *Tompkins v. Superior Ct.*, 378 P.2d 113, 115 (Cal. 1963)).

The majority relies on *Rosenbaum* for the proposition that qualified immunity applies if "not all reasonable police officers would believe that they lacked probable cause to make the arrest." However, the facts of *Rosenbaum* show

that it was unreasonable for the officers here to believe they had probable cause to arrest Stephen.

In *Rosenbaum*, one of the statutes on which the arresting officer relied had "no published authority, state or federal, that construes the provision, nor . . . any legislative history that clarifies its terms." *Rosenbaum*, 663 F.3d at 1077. Nonetheless, we concluded that the statute was unambiguous and that no reasonable officer could have believed the arrestee violated the statute. *Id.* at 1079.

Here, it has been clear since at least 1974 that California law prohibits a warrantless arrest in a home for obstructing a police investigation in violation of § 148. If we concluded in *Rosenbaum* that a reasonable officer should have known there was no probable cause to arrest under a statute which no published authority had addressed, certainly any reasonable officer should have known that California prohibited arresting someone in their home without a warrant solely for the minor offense of violating § 148.

The majority reasons that "the specter of an ongoing kidnapping likely colored the officers' belief of whether an obstruction of justice occurred." But a "specter" is not "knowledge or reasonably trustworthy information."[5] *Sialoi*, 823 F.3d at 1232; *see Sandoval*, 756 F.3d at 1165 (stating that "[t]he facts matter," and concluding that, with "no evidence of weapons, violence, or threats" at the home, there were triable issues of fact as to whether the warrantless entry was justified and that the officer was not entitled to qualified immunity). Similar to *Hopkins*, in which neither a

---

[5] In a similar persuasion-by-adjective attempt, the majority repeatedly refers to a "potential" or "possible" kidnapping. But this does not aid, advance, or replace the required probable cause analysis.

"potential medical emergency" nor the "investigation of a potential misdemeanor drunk-driving incident," based solely on a third party's statement, justified the warrantless entry and arrest, *Hopkins*, 573 F.3d at 761, 771, the "specter" of a "potential kidnapping victim," based solely on a third party's vague observation of a blindfolded woman, does not justify the warrantless arrest here.

As noted above, the facts are not unique. *See supra, footnote 3.* The majority does not explain what makes the facts so unique that the officers were justified in ignoring such basic, well-established constitutional principles as the requirements of a warrant, probable cause, and exigent circumstances in arresting someone in their home. The "salient question . . . is whether the state of the law" at the time of these events gave the officers "fair warning" that arresting Stephen in his home, without a warrant and without probable cause, based solely on an unconfirmed citizen report and for the minor offense of violating § 148, was unconstitutional. *Hope*, 536 U.S. at 741. The answer clearly is yes.

The protections of the Fourth Amendment cannot be swept aside merely by proclaiming that there was urgency, with no evidence to establish urgency, or by calling the facts "unique." Our clearly established precedent sets forth a framework to determine the reasonableness of the officers' actions, but the majority ignores this clear precedent. An arrest in a home requires a warrant supported by probable cause. A warrantless arrest is presumptively unreasonable. Relying on exigent circumstances requires probable cause, which they concededly did not have. Police officers may not simply ignore these clearly-established Fourth Amendment strictures. All of this law was clearly established at the time of the events.

It further was clearly established at the time of the events that an outright refusal to cooperate with police officers did not permit a warrantless arrest in a home and that a warrantless arrest in a home required probable cause. Nonetheless, the record shows that the officers threatened the Hills with arrest for obstructing their investigation and did not acknowledge or investigate Stephen's explanation that Benjamin was out with his wife. Instead, they quickly jumped to conclusions based on no evidence, escalating an innocent situation into a warrantless arrest unsupported by probable cause.

The majority does serious damage to the Fourth Amendment, doing away with the requirement of probable cause for a warrantless arrest in a home, and extending the exigent circumstances far beyond the "'few in number and carefully delineated' circumstances" we have described. *Struckman*, 603 F.3d at 743. The majority also errs by construing the facts in the officers' favor, allowing them to rely on conjecture and speculation, rather than showing specific and articulable facts to establish exigent circumstances, and failing to require them to show that a warrant could not have been obtained in time. The majority ignores our clearly established precedent, mistakenly concluding there was no such precedent prohibiting the arrest.

I respectfully dissent from the majority's affirmance of the dismissal of the unlawful seizure claim on qualified immunity grounds.[6]

---

[6] I would also reverse the dismissal of the related state-law claims.